Tracy v. Talmage, President, etc.

## SUPREME COURT—SPECIAL TERM.

### Before EDMONDS, Justice.

TRACY v. TALMAGE, President of the North American Trust and Banking Company.

Where a bank is authorized by law to purchase stocks, for a specific purpose, and all other purchases are declared to be invalid, the vendor of stocks, for such other purpose, cannot recover the price of them.

In such case, it is of no avail for the vendor to allege that he did not know of such purpose. He is bound to know, or, at least, to make every practicable inquiry for the purpose of knowing.

THE North American Trust and Banking company having failed, a receiver of its effects was appointed. The State of Indiana, acting through the Morris Canal and Banking company, as its agents, presented a claim to the receiver, who refused to pay it, and it was referred under the statute.

It appeared in evidence before the referee, that, after the Trust company had purchased the stocks necessary for deposit with the State Comptroller, as security for its circulating notes, it dealt largely in buying and selling stocks, to the amount of at least $5,000,000, and, among others, a large amount from the State of Indiana, and paid for the same by its circulating notes.

The claim now prosecuted was not on those notes, which were offered to be given up on the trial and canceled, but for the consideration money of the original purchase.

For the receiver, it was contended that the purchase being in violation of an express prohibition of the statute it was void, and no action would lie between the parties to enforce any part of the contract. But the State of Indiana insisted that they were in entire ignorance of the purpose for which

the stocks were bought, and whether the Trust Company had or had not obtained all the stocks it was authorized to hold. No evidence was offered that any inquiry had been made on that subject.

The referees reported that the claim was invalid, to which exceptions were taken, and the case, on those exceptions, was argued at the Special Term.

*A. Mann, jr.,* for claimants.

*J. Van Buren* and *A. C. Bradley,* for the receiver.

*Edmonds, J. :* Two facts are established, namely, that the North American Trust and Banking Company are indebted for $175,000 of the bonds of the State of Indiana, bought by them and not paid for, and that the debt, which originally seemed to belong to the Morris Canal and Banking company, is now vested in the State of Indiana by valid transfer.

In an equitable proceeding like this, the foregoing facts would entitle the State of Indiana to recover the amount of those bonds, unless there was something in the transaction so illegal as to work an absolute forfeiture of the claim.

It is insisted for the receiver, that the original transaction, out of which the claim flows, was so tainted, and that is the question for determination now.

It has long been the policy of our laws, to prohibit the banks of this State from becoming general dealers in stocks, and from emitting bills for circulation, payable otherwise than on demand and in coin.

This policy runs through the general banking law of 1838, and the acts amending it, with one exception, that it was contemplated that the banks established under it should be permitted to purchase such stocks as might be necessary to enable it to emit circulating notes, by a deposit with the Comptroller.

It was never intended that any of our banks should engage in such wholesale dealing in stocks as characterized the North

American Trust and Banking Company from the instant it shot into a portentous existence.

The chief means adopted by our State to enforce this policy has been, as in the kindred cases under the gambling and usury laws, by rendering null and void all contracts made in contravention of it, even though thereby the real and actual debt might be forfeited, and the party chiefly criminal be permitted to defraud the other party, by whose aid it was enabled successfully to violate the law.

The stern sense of justice, which has worked out such consequences, has overlooked the individual wrong in its anxiety for the public and general welfare, and for the protection of the whole community against the encroachments of those who have been thus intrusted with a portion of the State sovereignty — *that; namely, of coining money.*

And I am now called upon to say whether these claimants are placed in this situation either by reason of having themselves been originally engaged with the North American Trust and Banking company, in an illegal transaction, or as deriving title from those in whose hands the transaction was thus originally tainted.

The alleged illegality is not in taking, after the act of 1840 was passed, notes issued in violation of that act, for that objection is obviated by the offer now made to surrender the notes, and by the claim to recover, if at all, on the original consideration of the sale of the bonds.

It consists in the North American Trust and Banking company buying those bonds in violation of the law.

It is urged for the claimants, that neither they nor the Morris Canal and Banking company can be justly held responsible for the use which might be made of the bonds, or for the purpose for which they were bought, or for any secret intention of the buyers in regard to them. This does not necessarily follow. A man may sometimes be held responsible for the acts and secret intentions of others, when he is aiding them to violate the law, and when due caution and inquiry is necessary on his part to avoid such violation; he may be as responsible for

omitting to use such caution, or to make such inquiry, as if he had willingly participated in breaking the law. A cognate case will be found in bills or promissory notes given by banks. The statute requires them to be payable on *demand*. Yet they may, under certain circumstances, be given on time, and be valid. Now, when the note of a bank, payable at some future day, is offered, he who proposes to take it *is bound to inquire and to know whether it has been lawfully issued*. It will not do for him to say that he did not know; he is bound to know; and, in order to know, he must inquire and investigate. He knows that, in a certain case, a bank may give a note payable after date, and that in all other cases it can not do so. When such a note is offered to him, he must take care, at his peril, that it has been properly given.

So the Morris Canal and Banking company knew that the North American Trust and Banking company had power to purchase stocks, for the purpose of depositing with the Comptroller, in order to obtain circulating notes, and for no other purpose; and when the North American Trust and Banking company offered to buy of them so large an amount of State stocks, they were bound to inquire, and to know whether the purchase was within the legitimate scope of its authority, and they are responsible for their ignorance, when it was caused solely by their omission to perform the duty of inquiry.

They have no right to say now they did not know what the North American Trust and Banking company were intending to do with the bonds. They were bound to know, and probably did know. At all events, their ignorance is no excuse for them, when inquiry would have produced knowledge, and inquiry was a duty.

The question then is, not whether the Morris Canal and Banking company knew of any intended illegality, but solely whether the purchase of the bonds was in fact illegal.

I inquire, then, what was the purpose for which the North American Trust and Banking company purchased these bonds?

Mr Murray, who was one of the directors, states it in these words: "The North American Trust and Banking company

Tracy v. Talmage, President, etc.

were making arrangements for a very extensive business, and had been applied to by various institutions in the interior for State stocks to deposit with the Comptroller. Mr. Beers represented to the directors that we could make a handsome per cent, by taking these bonds and selling to these institutions for good security; and, at that period, if we sent them forward to England for sale, we could realize a profit of something like three per cent, and these securities would be an available source to raise money, in case we stood in need." Mr. G. D. Strong, one of the directors, says "that the purchase of Indiana stock was for the purpose of being transmitted to Europe for sale." He further testifies, "that their first purchase of stocks was in August, 1838, of $1,000,000 Arkansas stock, and one-half of it was purchased with the intention of applying whatever was necessary to a deposit with the Comptroller for circulating notes, being the only amount intended for that purpose. All the remaining purchases of State stocks were purchased for sale mostly in Europe."

The whole amount of bills received from the Comptroller never exceeded $330,000, and its average circulation was $20,000 to $30,000, while its purchase of State stocks amounted to about $5,000,000.

These facts show that the purchase of this stock, for the price of which this claim is prosecuted, was an illegal transaction, out of which no cause of action can arise.

I have spoken of this transaction as one with the Morris Canal and Banking company. It was so, in form, and, therefore, I have so spoken. But it is evident that the transaction was, in fact, by the present claimants, through that company as their agents.

That, however, is of no great moment, for, in either respect, in the view which I have taken of the original claim, which alone is now prosecuted, it can not be enforced.

The report of the referee must be confirmed, with costs.

[NOTE. — The question here involved, was ultimately decided in the Court of Appeals. (See 14 N. Y. R. 162.)]